OPINION OF THE JUSTICES TO THE GOVERNOR.

*Education. School and School Committee. Constitutional Law*, Equal
   protection of laws, Busing of school children.

On July 10, 1973, the Justices submitted the following answers to questions propounded to them by the Governor.

To His Excellency, the Governor of the Commonwealth:

The Justices of the Supreme Judicial Court respectfully submit these answers to the first three questions contained in the request of the Governor dated June 28, 1973, for an advisory opinion relating to a bill, House

No. 6657, pending before him.[1]   A copy of the bill was transmitted with the original order.   The bill is entitled, "An Act prohibiting transportation of pupils without the written consent of their parents or guardians."   The request recites that the Governor has "grave doubt as to the constitutionality of such bill if enacted into law."

The bill provides in part that "[n]otwithstanding any law to the contrary, no child attending public school shall be transported to or from any public school without the prior written consent of his parent or legal guardian. Each of such children shall be permitted to attend the school nearest his residence within his city or town, which has a seat available in his grade, unless his attendance at another school has been requested by his parent or legal guardian."

The questions are:

"1. Would the enactment of House No. 6657 be in violation of the Fourteenth Amendment of the Constitution of the United States guaranteeing the equal protection of the laws to all persons?

"2. Would the enactment of House No. 6657 be in violation of Article I of Part the First of the Constitution of the Commonwealth asserting the equality of its persons and their possession of certain unalienable rights?

"3. Would the enactment of House No. 6657 be in violation of Article X of Part the First of the Constitution of the Commonwealth guaranteeing the consti-

---

[1] On May 29, 1973, the Senate requested an advisory opinion from this court on questions set forth in an order transmitted to us on May 31, 1973.   Thereafter, we issued an order requesting briefs from interested parties to be filed on or before June 22, 1973, which was extended to June 26, 1973, at the request of the Attorney General. Upon receipt of amicus briefs, the court began its deliberations.   On June 28, 1973, the Legislature enacted House No. 6657 and sent it to the Governor without waiting for our opinion.   The Governor then requested an advisory opinion as noted above.   Although the Legislature's request for an advisory opinion has now become moot, we transmit a copy of our opinion to the Senate.

tutional principle of the equal protection of the law to all persons?

"4. Would the enactment of House No. 6657 be in violation of Article V of Part the First of the Constitution of the Commonwealth in that it delegates to certain private individuals legislative powers required to be exercised by the General Court on behalf of all the people of the Commonwealth from whom such powers derive?"

1. Supporters of this bill have argued that it merely enshrines the neighborhood school policy as a statutory right which any parent may insist upon if he so wishes. Recent United States Supreme Court decisions have made it clear that in cases involving de jure segregation the neighborhood school policy will not justify the local school committee's failure to take affirmative remedial action, including the involuntary busing of school children, to desegregate the schools. In *Keyes* v. *School Dist. No. 1, Denver, Colo.* 413 U. S. 189, 212 (1973), the court said: "We have no occasion to consider in this case whether a 'neighborhood school policy' of itself will justify racial or ethnic concentrations in the absence of a finding that school authorities have committed acts constituting *de jure* segregation. It is enough that we hold that the mere assertion of such a policy is not dispositive where, as in this case, the school authorities have been found to have practiced *de jure* segregation in a meaningful portion of the school system by techniques that indicate that the 'neighborhood school' concept has not been maintained free of manipulation."

In *North Carolina State Bd. of Educ.* v. *Swann,* 402 U. S. 43, the Supreme Court struck down a statute prohibiting the involuntary busing of students to achieve racial balance in North Carolina schools. In an unanimous opinion, Chief Justice Burger concluded that "an absolute prohibition against transportation of students assigned on the basis of race, or 'for the purpose of creating a balance or ratio,' will similarly hamper the ability

of local authorities to effectively remedy constitutional violations. As noted in . . . [*Swann* v. *Charlotte-Mecklenburg Bd. of Educ.* 402 U. S. 1, at 29], bus transportation has long been an integral part of all public educational systems, and it is unlikely that a truly effective remedy could be devised without continued reliance upon it." P. 46. Although the North Carolina statute was more explicit in its reference to racial balance, House Bill No. 6657 suffers from the same constitutional defect to the extent that its absolute prohibition against involuntary busing "would inescapably operate to obstruct" (the *Swann* case, *supra*, 45) remedies granted by Federal or State courts that have found de jure segregation. Since the United States Supreme Court "has held that under the Constitution school boards in de jure segregated districts are 'clearly charged with the affirmative duty to take whatever steps might be necessary' to eliminate segregation 'root and branch,' a statute which would proscribe a principal, and in some cases essential and exclusive step to achieve that end, must obviously violate constitutional requirements." *San Francisco Unified Sch. Dist.* v. *Johnson*, 3 Cal. 3d 937, 955. We state the above with full awareness that there has been no holding by any court that de jure segregation exists in Massachusetts[2] nor has any State court been called upon to decide that question.

2. The constitutional infirmity of the bill, however, is not contingent on a finding that de jure segregation exists. Our examination of the "historical context," "immediate objective," "and ultimate effect" of this bill (*Reitman* v. *Mulkey*, 387 U. S. 369, 373) leads us to conclude that the bill is unconstitutional on its face because it serves to perpetuate existing segregation in some of the schools, *regardless of its cause,* and thus "significantly encourage[s] and involve[s] the State" in racial discrimination. The *Reitman* case, *supra*, at 381.

---

[2] In *Morgan* v. *Hennigan*, U.S.D.C. (D. Mass.) No. 72–911–D, now pending, this issue has been raised as to the Boston school system.

The facts of the *Reitman* case parallel the tortured history of our racial imbalance law. The California Legislature had enacted legislation which prohibited private racial discrimination in the sale or rental of private dwellings. In 1964, the California Constitution was amended by passage of Proposition 14, which gave every Californian the constitutional right to lease or sell his private dwelling to whomever he wanted. The California Supreme Court conceded that since there was no constitutional duty upon the State to end private housing discrimination, the State could constitutionally repeal such legislation and retain a neutral stance toward such private discrimination. But the California Supreme Court held that Proposition 14 not only repealed pro tanto existing legislation prohibiting racial discrimination in housing, but also encouraged and significantly involved the State in private racial discrimination contrary to the Fourteenth Amendment by expressly sanctioning the private right to discriminate as a matter of State policy. In affirming the California Supreme Court's decision invalidating Proposition 14, the Supreme Court of the United States recognized that courts must assess the historical context, immediate objective, and "potential impact of official action in determining whether the State" has merely adopted a position of neutrality or one of encouragement of and involvement with private racial discrimination.

Thus, in the *North Carolina State Bd. of Educ.* case, 402 U. S. 43, Chief Justice Burger noted that the absolute prohibition against involuntary busing was constitutionally unsound not only because it interfered with efforts to disestablish dual school systems but also because it might interfere with efforts to operate a unitary system successfully. "We observed in *Swann, supra,* at 16, that school authorities have wide discretion in formulating school policy, and that as a matter of educational policy school authorities may well conclude that some kind of racial balance in the schools is desirable quite apart from any constitutional requirements. However, if a

state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishment of a dual school system, it must fall." P. 45.

This language suggests that even in situations where there is only de facto segregation, if the State adopts a policy which freezes these de facto conditions by imposing severe limitations on local school officials' discretionary authority to take effective remedial action, then the State policy constitutes State action serving to continue segregation in the schools and thus "significantly encourage[s] and involve[s] the State" in private racial discrimination. See *Reitman* v. *Mulkey*, 387 U. S. 369, 381; *Lee* v. *Nyquist*, 318 F. Supp. 710, 716 (W. D. N. Y.), affd. 402 U. S. 935 (where a three-judge court used this analysis in part to support its decision that a New York statute, which prohibited school boards from assigning students to schools on a racial basis to achieve racial balance, was unconstitutional). Thus, we must determine whether or not House Bill No. 6657 assumes a neutral stance toward de facto segregation by examining the bill's "historical context," its "immediate objective," and its "ultimate effect." The *Reitman* case, *supra*, at 373.

Before the enactment of this bill, the Commonwealth was committed to a policy of eradicating racial imbalance in its schools, a policy which was given concrete form by the passage of the racial imbalance law [3] in 1965. However, attempts to enforce this law have met with some local resistance. See *School Comm. of Boston* v. *Board of Educ.* 352 Mass. 693, 698 (1967), appeal dism. 389 U. S. 572 (where this court, in upholding the constitutionality of the racial imbalance law, noted that the Boston School Committee seemed "bent on stifling the act before it has a fair chance to become fully operative"). See also *School Comm. of Springfield* v. *Board of*

---

[3] See G. L. c. 15, §§ 1 I–1K, and c. 71, §§ 37C, 37D, inserted by St. 1965, c. 641. See also St. 1966, c. 14, § 41; St. 1969, c. 643; St. 1971, c. 958.

*Educ.* 362 Mass. 417 (1972) ; *School Comm. of Boston* v. *Board of Educ. ante,* 20 (1973).

House Bill No. 6657 arises in the context of this continuing debate over the racial imbalance law. The original order of the Senate referring the bill to us for an advisory opinion (see fn. 1) makes plain the racial context in which the Legislature viewed the bill. It notes that "compulsory busing of students in public schools as a method of insuring racial equality and further implementing the principle of equal protection of the law has aroused great controversy among our citizens as to its legal propriety." Thus, it is quite apparent from the bill's historical context that it was designed to prevent the use of busing as a means of achieving racial balance.[4] *Lee* v. *Nyquist,* 318 F. Supp. 710, 717.

However, House Bill No. 6657 does far more than merely repeal sub silentio effective enforcement of the racial imbalance law. The Legislature did not proceed by removing some or all of the special duties and remedies created by the racial imbalance law, an action which would have left school committees with their traditional power to use busing and redistricting as appropriate to deal with the problem of racially segregated schools. See the *Springfield* case, *supra,* at 440–441. Instead, by giving each child through his parent an absolute right to at-

---

[4] Both this court and the United States Supreme Court have held that busing of students is only one means, albeit often a necessary one, of desegregating our public schools. (See Mr. Justice Powell's concurrence in the *Keyes* case at 237–239). Even in situations where involuntary busing is the only effective remedy available, parents may raise valid objections "when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process." *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.* 402 U. S. 1, 30–31. However, our construction of the racial imbalance act in the *Springfield* case, insures that "safety be given the same weight as achievement of racial balance." 362 Mass. at 440. Moreover, we held that "school attendance districts, when redrawn for the purpose of achieving racial balance, must bear a reasonable, though not necessarily a fixed, proximity to recognized neighborhoods. A school committee may, for example, include several neighborhoods and more than one school within an attendance district, but it must not draw district lines in such a way as to create a very large gerrymandered district." 362 Mass. at 439–440.

tend the school nearest his home (that has an available seat), the bill would, in effect, if not in purpose, tie school assignments to *racially segregated residential patterns* because it provides distance from home as the sole criterion for determining school districting. Enforcement of this bill would encourage a segregated school system in any city or town such as Springfield or Boston that has segregated residential neighborhoods.

School committees are thus forbidden or excused from even inquiring into the existence, causes, and effects of housing segregation in their communities. One of the amici curiae briefs noted that, "no matter how strong a showing is made, for instance, that blacks are excluded by private or governmental prejudice from a given area, that the resulting school segregation is educationally harmful in itself, that certain blacks would benefit more from the facilities in the white school while certain whites would benefit more from those in the black school, and that the interchange could be accomplished without the slightest danger or inconvenience, the school committee is inhibited from districting to meet racial problems." We agree.

We conclude that this type of State-imposed limitation on a school authority's discretion not only "operates to inhibit or obstruct the operation of a unitary school system," *North Carolina State Bd. of Educ.* v. *Swann,* 402 U. S. at 45, but also uses State power to promote and entrench racial separation in all those schools whose communities have segregated residential patterns. See *Cisneros* v. *Corpus Christi Sch. Dist.* 467 F. 2d 142 (5th Cir.), where the Court of Appeals held that attendance districts created by tying school assignments to residential patterns known to be segregated created unconstitutional segregation. The court said, "Here, the Board, by a rigid superimposition of a neighborhood school plan upon the historic pattern of marked residential segregation that existed in Corpus Christi equated the residential homogeny to ethnic and racial homogeny in the public

school system, producing inevitable segregation. That there was an absence of state action involved in creating the city's residential patterns is of no significance. The Board imposed a neighborhood school plan, *ab initio*, upon a clear and established pattern of residential segregation in the face of an obvious and inevitable result." P. 149. The court concluded that such districting was necessarily unconstitutional since it results in the creation of segregated public schools by State action.[5]  See also *Kelly* v. *Guinn*, 456 F. 2d 100, 106, n. 7 (9th Cir.) ; *Spangler* v. *Pasadena City Bd. of Educ.* 311 F. Supp. 501, 522 (C. D. Cal.) ; *Bradley* v. *Milliken*, 338 F. Supp. 582, 592 (E. D. Mich.) ; *Oliver* v. *Kalamazoo Bd. of Educ.* 346 F. Supp. 766 (W. D. Mich.).

The California Supreme Court considered a statute quite similar to the bill before us in *San Francisco Unified Sch. Dist.* v. *Johnson*, 3 Cal. 3d 937. That statute provided that "no governing board of a school district shall require any student or pupil to be transported for any purpose or for any reason without the written permission of the parent or guardian." In upholding the statute but giving it a very limited effect, the court rejected on Federal constitutional grounds an interpretation which would prohibit local school committees from assigning students to schools not within walking distance without parental consent (an interpretation comparable to the explicit terms of cl. 2 of § 1 of the bill before us). The court explained that in rejecting this interpretation, "we do not assert that such assignment is in all instances constitutionally compelled. In some situations, however, it is the only practical and efficient method of achieving

---

[5] See Mr. Justice Powell's concurrence in the *Keyes* case, 413 U. S. at 241, where he notes that "the over-all integrative impact of such school board decisions must be assessed by district courts in deciding whether the duty to desegregate has been met. For example, 'neighborhood school plans are constitutionally suspect when attendance zones are superficially imposed upon racially defined neighborhoods . . .' *Keyes* v. *School District No. 1*, 445 F. 2d 990, 1005 . . . *United States* v. *Board of Education of Tulsa County*, 429 F. 2d [1253], 1258–1259."

school integration. An enactment which by flat legislative fiat prohibits any and all such assignments, exorcising a method that in many circumstances is the sole and exclusive means of eliminating racial segregation in the schools, *necessarily legislates the preservation of racial imbalance.* It therefore violates constitutional imperatives" (emphasis supplied). P. 943.

The California Supreme Court held that such an absolute prohibition against involuntary busing would be unconstitutional if applied to any districts manifesting racial segregation, whether de jure *or de facto in character.* The court's inclusion of de facto segregation rested on its holding that the statute "does not assume a neutral stance respecting de facto segregation of schools; it moulds a medium of obstruction to the elimination of that evil. It prohibits the use of a method that may be essential to desegregation: pupil assignment without the requirement of parental consent. Yet the state cannot constitutionally countenance obstructionism, for once the state undertakes to preserve de facto school segregation, or to hamper its removal, such state involvement transforms the setting into one of de jure segregation." P. 958.

Therefore, we conclude that House Bill No. 6657 violates the Federal constitutional guaranty of equal protection of the laws because it promotes and preserves segregated schools in the Commonwealth, and thus "significantly encourage[s] and involve[s] the State" in racial discrimination. The *Reitman* case, 387 U. S., *supra,* at 381. *Lee* v. *Nyquist,* 318 F. 2d, *supra,* at 716. *San Francisco Unified Sch. Dist.* v. *Johnson, supra,* at 958. The answer to the first question is "Yes."

3. The reasoning above supports our conclusion that this bill also violates arts. 1 and 10 of the Declaration of Rights of the Massachusetts Constitution. The guaranties contained in these articles are *at least* as great as those guaranties provided in the equal protection clause of the Federal Constitution. *Universal Adjustment Corp.*

v. *Midland Bank, Ltd.* 281 Mass. 303, 320.   The answers
to questions 2 and 3 are "Yes."

4.  In view of our answers to the first three questions,
we do not answer question 4.

> G. JOSEPH TAURO
> PAUL C. REARDON
> FRANCIS J. QUIRICO
> ROBERT BRAUCHER
> EDWARD F. HENNESSEY
> BENJAMIN KAPLAN   ·
> HERBERT P. WILKINS

