BLACK VOTERS et al., Plaintiffs,
Appellants,

v.

John J. McDONOUGH et al.,
Defendants, Appellees.

No. 76–1568.

United States Court of Appeals,
First Circuit.

Argued April 5, 1977.

Decided Oct. 17, 1977.

Roger L. Rice, Cambridge, Mass., with whom Margaret A. Burnham, Max D. Stern, Burnham, Stern & Shapiro, Boston, Mass., Stefan M. Rosenzweig, Jack Greenberg, and James M. Nabrit, III, New York City, were on brief, for plaintiffs, appellants.

Francis H. Fox, Joseph L. Kociubes, and Bingham, Dana & Gould, Boston, Mass., on brief for Lawyers' Committee for Civil Rights Under Law of the Boston Bar Association, Massachusetts Council of Churches, Massachusetts Coalition for Human Rights, Charles River Broadcasting Co., Unitarian Universalist Greater Boston Action League, and American Jewish Congress, amici curiae.

Derrick A. Bell, Jr., New York City, and Geraldine S. Hines, Roxbury, Mass., on brief for Aswalos House, Freedom House, Lena Park Community Development Corp., and United South End Settlements, amici curiae.

Norman G. Ross, Cochituate, Mass., for defendants, appellees.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, MILLER, Judge.*

PER CURIAM.

This is an appeal from the judgment and order denying relief in a class action seeking a declaration that the at-large method of electing members of the Boston School Committee dilutes the ballot strength of Boston's black voters in violation of the Constitution and the Voting Rights Act (42 U.S.C. §§ 1971, 1973 et seq.). We affirm but direct that the order below be without prejudice.[1]

The at-large system for electing the Boston School Committee, incorporated in Section 18 of the Boston City Charter, was adopted in 1875. Modified in 1906, this system provides that five school committeemen be elected by the city as a whole, each to hold office for the two municipal years following the municipal year in which he or she is elected. The district court found, with sufficient evidentiary support, that political parties play no part in either the candidacies or elections of School Committee members. Candidates become certified to run by obtaining the signatures of 2,000 registered voters on nominating petitions. If more than ten candidates qualify, a preliminary election is held six weeks prior to the general election, and the field is narrowed to the ten candidates receiving the most votes. In the general election voters may vote for one or more candidates, up to five, and the five receiving the most votes are elected. A candidate need not receive a majority of the votes cast to be elected. There is no ballot "place" rule. School Committee members need not reside in or represent any particular area of the city.[2]

At the time the at-large system was adopted, Boston's population was some 300,-000, of which approximately 1.5 per cent was black. By 1970 the population had grown to 640,000, of which 105,000, or approximately 16.4 per cent, were black. When this action was instituted, blacks comprised nearly 20 per cent of the citizens of Boston, and were concentrated in three contiguous neighborhoods of Roxbury, Dorchester, and the South End. Blacks formed a majority of the population in four wards of those neighborhoods, and in certain adjoining precincts.

In "an intensely local appraisal of the design and impact of the multi-member dis-

---

* Hon. Jack R. Miller of the United States Court of Customs and Patent Appeals, sitting by designation.

1. The court has been aided by briefs amici curiae filed by the Lawyers' Committee for Civil Rights Under Law of the Boston Bar Association, Aswalos, House, and others.

2. As was noted in the opinion below, (421 F.Supp. 165 (D.Mass.1976)), a survey conducted in 1974 by the National School Board Association showed that of the nation's fifty largest cities, thirty-two conduct their School Committee or School Board elections at large.

trict in light of past and present reality . . .", *White v. Regester,* 412 U.S. 755, 769–70, 93 S.Ct. 2332, 2341, 37 L.Ed.2d 314 (1972), the district court described the historic intertwining of racial issues and the politics of the Boston School Committee. A pattern of involvement by Boston blacks in the School Committee selection process has emerged. In all but two elections since 1961, black candidates have been nominated for the School Committee, have campaigned aggressively in the primary election, and have qualified to run in the final election. Although black candidates have enjoyed easy success in the predominantly black wards, no black has been elected to the School Committee.[3] A handful of white candidates espousing views in harmony with those of the black community has served on the School Committee during the past fifteen years, but none has been elected to office a second time.

Despite concerted efforts at increasing black voter participation, registration of voters in predominantly black wards and exercise of the franchise by qualified black voters in the primary and final School Committee elections have remained substantially below the city-wide averages. Except in 1965, when the level of participation by black voters nearly equalled that of whites, the average turnout for School Committee elections in two of the predominantly black wards has ranged from a low of 14–15 per cent in 1961 (compared to 23 per cent city-wide) to a high of approximately 37 per cent in 1971 (when the overall voting rate was 43 per cent).

Increasingly, the black and white communities have polarized over issues relating to segregation in Boston public schools.[4] The district court concluded that the most significant and relevant event during the two years preceding the 1975 School Committee election was the finding in *Morgan v. Hennigan,* 379 F.Supp. 410, 484 (D.Mass.) *aff'd sub nom. Morgan v. Kerrigan,* 509 F.2d 580 (1st Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), that Boston public schools had been unconstitutionally segregated by the purposeful actions of the School Committee and the superintendent of schools and the ensuing court order to formulate and implement "plans which shall eliminate every form of racial segregation in the public schools of Boston, including all consequences and vestiges of segregation." Quoting at length from *Morgan v. Hennigan,* the district court described the "inflamed atmosphere" in the city over desegregation and busing under a plan of the State Board of Education which the Supreme Judicial Court of Massachusetts had directed the School Committee to implement, beginning in September of 1974.[5]

In June of 1974, a special election was held to consider four alternative plans for changing the composition and manner of election of the School Committee. The plan that received the most votes, one that would have abolished the School Committee and replaced it with a city-wide committee appointed by the mayor and decentralized neighborhood councils, was listed as "Question 7" on the ballot in a city-wide referendum held in the fall. It was defeated. The district court found that, although antibusing forces actively opposed Question 7, many who worked against it had supported

---

3. Black candidates have carried Boston in other elections. In 1969 a black was elected to the Boston City Council under an at-large method virtually identical to that challenged here. At the state level, a black defeated his white opposition at the Boston polls and was elected and reelected Attorney General of the Commonwealth of Massachusetts. That same individual has served two terms as United States Senator from Massachusetts, the second with the support of a majority of Boston voters.

4. The district court found, however, that busing per se had not been the only important issue in

recent School Committee elections, mentioning specifically the "*quality* of educational opportunity" question.

5. *See School Committee of Boston v. Board of Education,* 364 Mass. 199, 302 N.E.2d 916 (1973); *School Committee of Boston v. Board of Education,* 363 Mass. 20, 292 N.E.2d 338 (1973). *See also Opinion of the Justices,* 365 Mass. 648, 310 N.E.2d 348 (1974); *Opinion of the Justices,* 363 Mass. 899, 298 N.E.2d 840 (1973).

one of the three other plans considered in the special election and viewed the plan embodied in Question 7 as "a power grab by the Mayor". Voting on Question 7, and indeed views on busing, crossed racial lines.

█ Any analysis of the at-large system under attack here must begin with an acknowledgement that multi-member districts are not *per se* invalid. *Fortson v. Dorsey,* 379 U.S. 433, 438–39, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). Such schemes will be struck down only when the challenger carries a burden of proving that the system was instituted to further racially discriminatory purposes or that the effect of the method is "to minimize or cancel out the voting strength of racial or political elements of the voting population". *Id.* at 439, 85 S.Ct. at 501; *Burns v. Richardson,* 384 U.S. 73, 88, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).[6]

The conclusion by the district court that the selection process for the Boston School Committee was not instituted with intent to discriminate against black voters is clearly supported by the court's findings of fact. This is not a case such as *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), where the multi-member system was devised, despite historic policy and a state statute forbidding it, in reaction to a dramatic voter registration drive directed at blacks, who, although comprising 58 per cent of the parish's population, had not been permitted to vote until 1962. In 1875, when Boston's at-large system was adopted, blacks made up only 1.5 per cent of the city's population; they had been enfranchised for years. No long-standing policy or statute weighed against the use of a multi-member system, and indeed, since quality education was a matter of city-wide concern, the establishment of a body responsive to the entire city electorate had a rational basis.

It may be, however, that a purposeful denial of constitutional rights can be found in the maintenance of a system which, although racially neutral at its inception, has developed a known discriminatory effect.[7] The appropriate inquiry is, therefore, whether analysis of the record of this case in light of the factors set forth in *White v. Regester, supra,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314, *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) and their progeny reveals that the effect of the at-large system is to deprive Boston's black voters of equal access to the process of selecting School Committee members.[8]

▪ █ A number of the factors highlighted by the case law appear in the record of this case and were found by the district court to

---

6. After *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) a challenger may be required to show both a discriminatory intent and a disproportionate impact on a protected group to prevail in an equal protection attack on an electoral system. Because we find the second component to be insufficiently established on this record, we need not decide the extent to which the standards set forth in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1972) and *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) have been altered.

7. That the opportunity to change the at-large method was presented to the Boston electorate when "Question 7" appeared on the autumn, 1974 special ballot, and that the voters chose to keep it, would not require us to stay our hand. In *Lucas v. Colorado General Assembly,* 377 U.S. 713, 737, 84 S.Ct. 1459, 1474, 12 L.Ed.2d 632 (1964), the Supreme Court held countenancing by the electorate of an impermissible apportionment scheme to be "without federal constitutional significance, if the scheme . . . fails to satisfy the basic requirements of the Equal Protection Clause".

8. Appellants contend that the district court misperceived the issue in this case to be whether the selection process is open to black voters at all. *The real question, they say, is whether* blacks have less opportunity to participate in choosing School Committee members. We accept appellants' framing of the issue, but are satisfied by the opinion below that the district court understood the appropriate inquiries and reached its conclusions accordingly. We need *only refer to the court's quotation of the language* in *White v. Regester, supra,* 412 U.S. at 765–66, 93 S.Ct. 2332.

point to a racially discriminatory impact.[9] Boston blacks are undeniably an "identifiable class for Fourteenth Amendment purposes" and have particular needs and interests in the functions of the School Committee, many of which diverge from those of the population as a whole. *Whitcomb v. Chavis, supra,* 403 U.S. at 134–35, 91 S.Ct. 1858. Similarly, there is no question that blacks in Boston have historically been the victims of discrimination in many significant aspects of their existence.[10] Particularly striking is the history, much of it of recent vintage, of discrimination in education—the realm of responsibility of the School Committee. *See Wallace v. House,* 515 F.2d 619, 628 (5th Cir. 1975), *vacated and remanded,* 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976); *Morgan v. Hennigan, supra,* 379 F.Supp. 410.

Certain mechanical features of the at-large system for selecting the School Committee make it possible to submerge these cognizable minority interests. *See Wallace v. House, supra,* 515 F.2d at 627. The political subdivision is large, consisting of the entire city of Boston. *Whitcomb v. Chavis, supra,* 403 U.S. at 143, 91 S.Ct. 1858. Five School Committee members represent a population in excess of 641,000. *See Wallace v. House, supra,* 515 F.2d at 622 (5 aldermen responsive to a population of

5,200); *Burns v. Richardson,* 384 U.S. 73, 76 n. 2, 82, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966) (500,409 citizens of Honolulu represented by 19 senators, 36 representatives). There is no provision for geographic subdistricts or residence requirement that prevents all School Committee members from being elected from the same area or interest group or avoids the possibility of a "majoritarian monopoly", *Wallace v. House, supra,* 515 F.2d at 627.

█ Although blacks and black-supported candidates have repeatedly campaigned for the School Committee, and one black may have been elected prior to 1900, it is undisputed that in recent years the at-large system has produced no black winner.[11] *See White v. Regester, supra,* 412 U.S. at 766, 768, 93 S.Ct. 2332 (since the Reconstruction, 2 blacks had been elected to the Texas legislature from predominantly black Dallas County). A variety of circumstances aggravated by the mechanics of the at-large system help to explain this consistent defeat: black voter alienation stemming from discrimination and other disadvantages; intimidation of black candidates and their workers; use by certain white candidates and their supporters of racial campaign tactics.[12] *See White v. Regester,*

---

**9.** Standards for evaluating the constitutional validity of an at-large plan differ depending on whether a federal court or a state legislative body initiated its use. *E. g. Chapman v. Meier,* 420 U.S. 1, 18, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *see Connor v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 1833, 52 L.Ed.2d 465 (1977).

**10.** As the district court found, the areas of discrimination against blacks have ranged from housing, to municipal services, to employment, *see Boston Chapter, N.A.A.C.P., Inc. v. Beecher,* 504 F.2d 1017 (1st Cir. 1974) (firefighters); *Associated General Contractors of Massachusetts, Inc. v. Altshuler,* 490 F.2d 9 (1st Cir. 1973) (construction trades); *Castro v. Beecher,* 459 F.2d 725 (1st Cir. 1972) (police).

**11.** Appellants properly concede that equal access to the at-large electoral system does not entitle them to the election of black community candidates in proportion to black voting potential. *See White v. Regester, supra,* 412 U.S. at 765–66, 93 S.Ct. 2332; *Whitcomb v. Chavis, supra,* 403 U.S. at 136, 149, 91 S.Ct. 1858. Together with other factors, however, the ab-

sence of any black-supported winners is some indication that the system may have had the effect of minimizing minority interests. *White, supra.*

**12.** Appellants argue that the district court "erred in its assessment of the racial significance of the school desegregation issue" by failing "to accord proper weight to evidence of racial infection of the political scene". They dispute the district court's conclusion that although unmistakable, "campaign tactics that appeal to purely racial animosity have not been dominant". The district court agreed with appellants that "certain groups have engaged in some racial campaign tactics during recent School Committee elections", and condemned them as "despicable in any form and to any degree". However, the court concluded, and the record supports the conclusion, that the lack of success by black-supported candidates is more readily explained by low black voter participation and the strong feeling engendered by the busing issue.

*supra*, 412 U.S. at 767, 93 S.Ct. 2332; *Wallace v. House, supra*, 515 F.2d at 625.

Whatever the cause of the defeat of black candidates, a School Committee has emerged that has often been unresponsive to the needs of the black population. *See Whitcomb v. Chavis, supra*, 403 U.S. at 135, 91 S.Ct. 1858. In many instances the quality of education provided by the City for black children has been substantially lower than that afforded most whites.[13] Issues of racial discrimination have arisen in the hiring and assignment of teachers and administrators, and in racially-biased textbooks. *De facto* segregation in the schools, tolerated and promoted by the School Committee, is only beginning to be eliminated through the last-resort intervention of the court. *See Morgan v. Hennigan, supra*, 379 F.Supp. 140.[14] Court orders to remedy those shortcomings have met with persistent refusal by certain members of the School Committee, who have engaged in derogatory and occasionally inflammatory public comment on their black constituents. Some members of the School Committee have attempted to use School Committee resources to oppose busing, an issue which, although prompting dispute that crosses racial lines, has a substantial impact on the black community. Many of the appellants' allegations regarding the adverse effects of the at-large system on black interests are thus not without considerable support in the evidence.

On the other hand, a number of factors found by case law to minimize minority votes are missing from the record presented below. Notably absent are some discriminatory mechanical features of other at-large methods. No "place" rule relegates candidates to a specific spot on the ballot. *See White v. Regester, supra*, 412 U.S. at

766, 93 S.Ct. 2332. Majority vote is not a requirement of survival in the primary or the final election. *Id.* The absence of an anti-single shot provision permits black voters to concentrate their strength on the candidates of their choice. *Id.; Zimmer v. McKeithen, supra*, 485 F.2d at 1306. And there has been no special impediment to black registration. *Id.* at 1301.

Although certainly pervasive, the history of discrimination against Boston's blacks has not crippled their ability to exercise their franchise. *Id.* The record below does not establish that blacks have fewer opportunities than whites to register to vote or to cast their ballots. *See Whitcomb v. Chavis, supra*, 403 U.S. at 149, 91 S.Ct. 1858. No poll tax or literacy test has had the effect of restricting their access to the electoral process. *See White v. Regester, supra*, 412 U.S. at 768, 93 S.Ct. 2332. Indeed, the city has conducted programs to encourage black voters to register.

In contrast to circumstances found in decisions which have discerned the existence of a discriminatory effect in an at-large system, political parties in Boston neither are exclusively controlled by the white majority nor play a significant role in the nomination or election of School Committee members. *Id.* at 766, 93 S.Ct. 2332; *see Whitcomb v. Chavis, supra*, 403 U.S. at 134–35, 91 S.Ct. 1858. Any citizen who obtains the signatures of 2000 registered voters may run in the primary. As noted above, black candidates have done so in all but two elections since 1961.

Appellants suggest that the at-large system makes it possible for majority candidates to overlook the black community, yet not risk defeat at the polls. *See Whitcomb v. Chavis, supra*, 403 U.S. at 150, 91 S.Ct. 1858. However, white candidates with

---

13. This is not to say that this unresponsiveness has been solely color-based. As the district court said, *supra*, 421 F.Supp. at 190:

"But the Committee's lack of responsiveness in meeting its responsibility to provide quality education for the children of Boston has victimized whites as well as blacks, particularly the underprivileged and less fortunate of both races. The record makes clear that

some schools in Boston's poor white areas have been, and continue to be, as inadequate as those in the black areas."

14. Subsequent alleviation of these conditions does not remove their debilitating effects on the political process, particularly here, where correction is merely in progress. *See Zimmer v. McKeithen*, 485 F.2d 1297, 1301 (5th Cir. 1973).

avowed commitment to improving educational opportunities for blacks have been elected to the School Committee, albeit defeated for reelection. *Id.* at 150 n. 30, 91 S.Ct. 1858. Similarly, the fact that the total vote for white candidates in black wards has nearly always exceeded the combined vote for black candidates in those areas, although susceptible to several interpretations, does support a conclusion that to some extent, black views are solicited and white candidates have been acceptable to the black community.[15]

That black candidates have carried Boston in other elections, and one black won a seat on the City Council in an at-large race virtually identical to the method attacked here, provide some indication that black interests can be represented through an at-large election and that factors other than an inherently discriminatory system may be at work. *But see Zimmer v. McKeithen, supra,* 485 F.2d at 1307. Surely, for example, the unusually low registration and voting rates for School Committee elections in the predominantly black wards account in part for the lack of success of black-supported candidates in those campaigns. That condition is subject to change without court intervention. *See Wallace v. House, supra,* 515 F.2d at 629. Based on the record, briefs, and oral arguments before us, we are unable to say that the district court erred in failing to conclude that, under the at-large system of electing members of the School Committee of Boston, black voters are deprived of their rights under the Constitution and the Voting Rights Act.

We do, however, take issue with the district court's assessment that current court intervention in the operation of the Boston Schools in some manner demonstrates a reduced need for electoral reform. The con-

trary is more likely to be true. Court control of the schools is a more drastic remedy than taking whatever steps, if any, may be proper to ensure full and equal participation in the political process by all groups. To the extent the School Committee demonstrates a continuing inability to run the schools, except under court control, in such a manner as to provide equal education to all elements of the community, this would tend to fortify plaintiffs' position that Boston's at-large system is operating to exclude the black community from access to the political process.

We cannot quite say on the present record that plaintiffs have demonstrated such an exclusionary effect. But our decision is close, and in affirming the district court, we do so provisionally and without prejudice to plaintiffs' right to reopen their claim in the future in light of circumstances as they may then appear. We direct the district court to retain jurisdiction and, no sooner than one year from the date hereof, we authorize it, in its discretion, to hold supplemental proceedings on an amended petition, should plaintiffs choose to file one, seeking the relief now denied. In considering such an amended petition, the district court should take account of whether the situation in relevant respects has improved or has worsened so as to alter the present calculus.

*Affirmed with directions to retain jurisdiction in accordance herewith.*

---

15. Evidence adduced at the trial showed that while some white candidates have campaigned in the predominantly black wards, other particularly well known white candidates have openly avoided seeking the support of black voters and have been victorious. Appellants argue that the district court erred in finding such evidence dispositive of their assertion that

black voters have been "fenced out" of the political process. The district court was in a better position than we are to determine what relative weight to assign such evidence, and the fact that its conclusion on this point may not be what appellants wished does not mean the evidence was ignored.