LATINO POLITICAL ACTION
COMMITTEE, INC., et al.,
Plaintiffs,

v.

CITY OF BOSTON, et al., Defendants.

Civ. A. No. 83-2472-C.

United States District Court,
D. Massachusetts.

May 22, 1985.

Joseph L. Kociubes, Jonathan W. Fitch, Bingham, Dana and Gould, Alan Jay Rom, Lawyers' Comm. for Civil Rights, Boston, Mass., Frank R. Parker, Lawyers' Comm. for Civil Rights, Washington, D.C., for plaintiffs.

City of Boston Law Dept., Steven Perlmutter, Suzanne F. Sheats, Boston, Mass., for City of Boston, Mayor White, Michael Joyce & Boston Election Com'n.

Stephen H. Oleskey, Jane D. Kaplan, Hale and Dorr, Paul F. Saba, Boston, Mass., for Members of Boston City Council.

## OPINION

CAFFREY, Chief Judge.

This is a civil action in which plaintiffs challenge the City of Boston's plan for the election of City Council and School Committee members by district. Plaintiffs are four non-profit organizations which seek to increase minority participation and influence in politics, and twelve individuals who are residents and registered voters of Boston. Defendants are the City of Boston; its mayor, Raymond L. Flynn; the Boston Election Committee; and Michael A. Joyce, Commissioner of Elections of Boston and Chairman of the Boston Election Commission. After a bench trial, I find and rule as follows:

Plaintiffs contend that the geographical configuration of the nine electoral districts created by the City's plan impermissably dilutes minority voting strength. The plan allegedly minimizes the political impact of minority votes in three specific ways: it consolidates or "packs" the Black population into only two districts; it divides or "fragments" the Hispanic population among several districts, and it places the racially and ethnically diverse population of Boston's South End in a district which is politically dominated by South Boston, an area whose virtually all White population is reputed to be hostile toward minorities. Plaintiffs assert that, by denying minorities equal access to the political process, the plan violates Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, as amended; the Fourteenth and Fifteenth Amendments to the United States Constitution; and Articles 1 and 9 of the Declaration of Rights of the Massachusetts Constitution.

*Size and Location of Boston's Minority Populations*

According to the 1980 census, minorities comprise approximately 31.5% of Boston's population. 22.4% of the City's residents are Black, 6.4% are Latino and 2.7% are Asian.[1] Most of Boston's predominantly Black precincts are located in the central part of the city, where they form an oblong running north to south. The City's Latino population is concentrated in several discrete pockets along the southern, eastern and western perimeters of the Black population, while Boston's Asians live primarily in three contiguous precincts located to the Northeast of the other minority concentrations.

*History of the Present District Plan*

From 1951 until January 1984, Boston's City Council consisted of nine members elected at large, and the School Committee consisted of five members elected at large. In a referendum held on November 3, 1981, Boston's residents voted to adopt a new electoral structure for the two municipal bodies. The new plan provided that the City Council and the School Committee each would be composed of nine members elected on a one-member per district basis, with certain additional members elected at large. The number of at-large members was to be determined according to the City's total population. In December, 1982, the state legislature amended the plan to provide that each body should have exactly four at-large members in addition to the nine members elected by district.

The state legislature also gave the City Council authority to establish the City's nine new electoral districts. In mapping the new districts, the City Council was to be guided by the provisions of M.G.L. c. 43 § 131, which states, in relevant part:

Each such district shall be compact and shall contain, as nearly as may be, an equal number of inhabitants, shall be composed of contiguous existing precincts, and shall be drawn with a view toward preserving the integrity of existing neighborhoods.

In December, 1981, a Special Committee of the City Council was formed to draw the nine district plan. After holding public hearings and analyzing demographic data about the City, the Special Committee constructed a plan which it adopted by ordinance on February 24, 1982. On September 8, 1982, representatives of Boston's minority residents, many of whom are plaintiffs in the present action, filed a lawsuit challenging the legality of that plan. *Latino Political Action Committee v. City of Boston,* 568 F.Supp. 1012 (D.Mass. 1983) (*Latino I*). The plaintiffs in that action charged that the district plan violated the constitutionally mandated apportionment standard of "one person, one vote", *Gray v. Sanders,* 372 U.S. 368, 381, 83 S.Ct. 801, 809, 9 L.Ed.2d 821 (1963), and that it impermissibly diluted minority voting strength. Because this Court thereafter invalidated the plan on the basis of the one person, one vote principle, the Court did not reach the question of vote dilution. 568 F.Supp. 1012.

In response to this Court's order in *Latino I,* the Special Committee endeavored to design a new district map. To aid it in its task, the Committee held public hearings on August 4 and 10, 1983, at which interested citizens, including representatives of Boston's Black, Hispanic and Asian populations, stated their positions and offered various proposals for new district plans. At the hearings, the Committee was reminded that any plan which minimized the voting power of minority groups would be invalid and would be challenged in court.

On August 10, 1983, the City Council adopted the plan which is now in effect. Under this plan, Black voters control two of the City's nine districts, Districts 4 and

---

1. These census figures for Boston's Blacks and Hispanics are slightly inflated, because each figure includes approximately 4,000 individuals who are both Black and Hispanic. According to the testimony of defendants' expert, Kimball Brace, elimination of the "double count" reduces the percentage of Blacks in Boston to 21.7%, the percentage of Hispanics to 5.7%, and the percentage of combined minorities to 30.8%.

7. Neither the Hispanic nor the Asian population, each of which is less than one-third the size of the Black population, controls any district. Although most of Boston's Asians live in a compact geographical area within District 2, there are sizable Hispanic concentrations located in five of the nine districts. On August 23, 1983, plaintiffs filed the action now before the Court. Despite this legal challenge to the district plan, the plan was used as the basis for the City Council and School Committee elections held in November, 1983. The validity of those election results is not at issue in this case.

*Amended Section 2 of the Voting Rights Act of 1965*

In 1982, Congress amended Section 2 of the Voting Rights Act of 1965 in response to the Supreme Court's decision in *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). *Bolden* held that proof of discriminatory intent is not only an essential element of a vote dilution claim brought under the Fourteenth and Fifteenth Amendments, but also a necessary part of a claim brought under Section 2. Under the amended Section 2 of the Voting Rights Act, discriminatory intent is no longer an essential element in a lawsuit claiming that an election plan violates minority voting rights. Section 2 now states:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973, as amended June 29, 1982.

The legislative history of the 1982 Amendment explains that, in evaluating the "totality of circumstances" under which a particular electoral mechanism operates, a court should be guided by the analytical framework established in the pre-*Bolden* cases of *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973). The legislative history also sets forth a list of typical factors, derived from these two cases, which bear upon the issue of vote dilution. These factors include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political

subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

Senate Report No. 417, 97th Cong., 2d Sess. 28–29 (footnotes omitted), *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 206–7.[2]

Courts which have decided vote dilution cases brought under the revised Section 2 have recognized that the factors articulated in *Zimmer v. McKeithen,* and later incorporated in the statute's legislative history, were designed primarily to help determine the validity of multimember districts rather than that of discrete electoral units. *E.g., Ketchum v. Byrne,* 740 F.2d 1398, 1405 (7th Cir.1984). When the placement of district lines is at issue, however, the factors of racial polarization and the extent to which minorities have been elected to office take on additional significance, because these two factors are tied particularly

closely to plaintiffs' claims of packing and fragmenting. The other factors nevertheless remain important as a means of assessing the historical, sociological, and political climate in which an electoral scheme functions. *See Ketchum,* 740 F.2d at 1405. Because the fairness of a voting plan cannot be determined without considering the nature of the population which the plan affects, the evaluation of Boston's existing district plan must begin with an analysis of these "background" factors.

*Factors affecting Minorities' Ability to Participate In the Political Process*

The record makes abundantly clear that Boston's minorities continue to suffer socioeconomic disadvantages. Census data pertaining to Boston reveal, for example, that a much higher percentage of minority families than white families are below the poverty level; a lower percentage of minorities than Whites hold high school diplomas; and the median income of minorities is lower than that of Whites, even when the variables of age and education are taken into account. In addition to having both a shorter than average life expectancy and a higher infant mortality rate than Whites, Boston's minorities, particularly its Blacks, are victims of residential isolation as well. Although the recent growth of the City's Black population has been more than matched by the decline of its White population, Blacks nevertheless remain confined to the City's geographic core.[3]

Despite the evidence produced at trial that discrimination against minorities persists in Boston, the record further suggests that such discrimination has not significantly impaired the ability of Blacks, Boston's largest minority group, to participate in the City's political life. Plaintiffs' own wit-

---

**2.** This enumeration of factors is slightly different from that articulated in *Zimmer.* Unlike *Zimmer,* the congressional list establishes both polarized voting and as elements of primary importance, while it relegates two *Zimmer* factors—responsiveness of elected officials and tenuousness of the underlying policy—to the status of marginal significance. *Jones v. City of Lubbock,* 727 F.2d 364, 384 (5th Cir.1984).

**3.** Numerous decisions from the First Circuit also illustrate the existence of discrimination against Boston's minorities in the areas of employment, education and housing. *See e.g., Black Voters v. McDonough,* 421 F.Supp. 165, 175 (D.Mass.1976), *aff'd,* 565 F.2d 1 (1st Cir. 1977), and cases cited therein; *Morgan v. McDonough,* 689 F.2d 265 (1st Cir.1982); *NAACP v. Harris,* 567 F.Supp. 637 (D.Mass.1983).

744

ness, James Jennings, who is a political scientist and the current president of the Black Political Task Force, testified at trial:

I have found that the extent of black political participation in the City of Boston is very high and very intense. I have also found that this very high degree of political participation and sophistication on the part of the black community is consistent with a long history of black political participation in the City of Boston dating back many, many decades.

Transcript at 4–83. When questioned about the variables which affect voter turnout, Dr. Jennings stated, "[p]olitical scientists found out that the higher one is on a socio-economic ladder, the more one tends to vote. That finding has been discarded as far as the black community is concerned." *Id.* at 4–84. Dr. Jennings further testified that Black voter registration and turnout in Boston is "basically similar" to that of White voters, *id.,* and that Black voters have been, and continue to be, "a crucial element in Boston politics." *Id.* at 4–97.

This testimony is consistent with the fact that the City's Black residents have been enfranchised for more than a century, *Black Voters v. McDonough,* 565 F.2d 1 (1st Cir.1977), and have never been subjected to poll taxes, literacy tests, or other such barriers to registration, whose lingering effects continue to inhibit political participation by minorities in other parts of the country. *See e.g. Buskey v. Oliver,* 565 F.Supp. 1473, 1475 (M.D.Ala.1983); *Gingles v. Edmisten,* 590 F.Supp. 345, 359–60 (E.D. N.C.1984) (three-judge panel), *appeal docketed,* 52 U.S.L.W. 3908 (U.S. June 2, 1984) (No. 83–1968).

Furthermore, the City's present electoral scheme is devoid of any practices or procedures which can operate to minimize the impact of minority votes. In Boston there is no prohibition against "bullet voting," the casting of fewer than the total number of votes allowed. In fact, the record suggests that minority voters are aware of the advantage of bullet voting and have used it extensively to maximize the impact of their votes. Moreover, the voting power of Boston's minorities is enhanced by the use of a limited voting system in the preliminary elections for members of the City Council and School Committee. Under such a system, the number of votes each voter may cast is less than the number of candidates who qualify for the final election. In Boston's at-large primaries, for example, each voter may cast no more than four votes, even though the top eight candidates earn a place on the final ballot. Such a system makes it difficult for majority voters to control the full slate of finalists.

Like the opportunity to vote, the opportunity to seek elective office is completely open to Boston's minorities. Boston has no candidate slating process. Any person may run for office if he or she 1) is a registered voter of the City qualified to vote in the election for that office; 2) submits a nominating petition signed by a designated number of registered voters qualified to vote in that election; and, 3) for district seats, is a resident of the district which he or she seeks to represent. Boston also has no ballot "place" rule; the position of candidates' names on the ballot is determined by lot. Furthermore, the City has no requirement that a candidate earn a majority of the votes in the primary in order to qualify for the final election.

The evidence reveals that, in the last twenty years, many minorities have taken advantage of Boston's open nomination process and have run for seats on the City Council and School Committee. *See Black Voters v. McDonough,* 421 F.Supp. 165. Although these minority candidates may sometimes have encountered hostility from some segments of the City's White population, there is no evidence that Boston's campaigns have ever been characterized by the sort of insidious and recurring racial appeals which have pervaded state and local campaigns in other parts of the nation, particularly the South. *See, e.g., Gingles v. Edmisten,* 590 F.Supp. at 364. In *Black Voters,* Judge Tauro found that some of Boston's White candidates had resorted to racial campaign tactics during the 1960's

and 1970's, but he also determined that the use of such tactics had not been dominant in those elections. 421 F.Supp. at 190. Furthermore, the evidence suggests that the use of racial appeals may have abated in the period since *Black Voters* was decided. Other than an incident of verbal intimidation directed at a campaign worker in 1983, the record in this case contains no indication that the use of racial tactics has been a part of the City's elections since 1977. There was, in fact, testimony that the theme of racial harmony played a major role in the campaigns of some candidates in the 1983 elections.

Despite the socioeconomic deprivations which Boston's minorities continue to endure, the evidence produced in this case demonstrates that the impact of discrimination has not adversely affected minorities' access to the political process. This conclusion alone, however, does not resolve the ultimate issue of whether Boston's district plan operates to minimize minority voting strength. It is also necessary to examine the merits of plaintiffs' specific allegations regarding the electoral effects of the City's districting scheme.

*Factors Affecting Minorities Ability to Influence The Political Process Under the Existing District Plan*

The fairness of an electoral system based on discrete districts, like the one at issue in this case, cannot be determined without considering the extent to which the voting population is racially polarized. Plaintiffs' expert witness, Dr. Gordon Henderson, defined racial polarization, or racial bloc voting, as "the tendency for voters among one racial group to vote for candidates of that same racial group and against candidates of another racial group." Transcript at 2–148. Racially polarized voting, in and of itself, neither minimizes nor maximizes minority voting strength. Where bloc voting is shown to exist, however, its operation within the context of the particular districting scheme at issue is ordinarily the linchpin of a vote dilution claim. *United States v. Marengo County Commission*, 731 F.2d

1546, 1566 (11th Cir.1984); *Gingles v. Edmisten*, 590 F.Supp. at 355.

If a voting population casts its ballots without regard for race, the placement of district boundaries has no effect on minority voting strength as long as each district contains an equal number of voters. If an electorate is racially polarized, however, the placement of district lines may dilute minority voting power either by "packing" minority residents into a limited number of districts, or by "fragmenting" the minority population among several districts. Before reaching plaintiffs' claims of packing and fragmenting, therefore, it is first necessary to determine whether Boston's voting population is, in fact, racially polarized.

In *Black Voters v. McDonough*, 421 F.Supp. 165, Judge Tauro examined the results of Boston's School Committee elections from 1960 through 1975 and concluded that racial bloc voting occurred in Boston to some degree. Nevertheless, he determined that such racial polarization was not extreme; in both Black and White areas of the City, he found that many voters did not cast their ballots along racial lines. 421 F.Supp. at 190.

The evidence produced at trial concerning the City's 1983 elections reveals that a moderate degree of racial polarization continues to characterize Boston's electorate. In the final election for at-large members of City Council, for example, minority candidates won only 5.6% of the total votes cast in precincts whose populations are 90% or more non-Black. By contrast, 40.9% of the votes cast in such precincts in the final election for at-large members of the School Committee went to minority candidates. It is noteworthy, however, that both of the minority candidates chosen for School Committee by these non-Black precincts were long-time incumbents. This evidence suggests that, although residents of Boston do not vote strictly along racial lines, racial polarization nevertheless continues to be a significant feature in the electoral profile of Boston's population. Because such bloc voting can interact with the placement of district boundaries to reduce minority vot-

ing power, it is necessary to consider each of plaintiffs' specific dilution claims.

### Packing of Blacks in Districts 4 and 7

Plaintiffs contend that Boston's district plan minimizes the voting strength of the Black population by packing it into only two districts in the center of the City. Dilution by packing may occur when a segment of the population which votes cohesively is concentrated in a particular district in numbers significantly greater than those necessary for that group to control the outcome of the district's elections. Courts and reapportionment experts have estimated that a minority population of at least 65% in a single member district is necessary to give minority voters a reasonable opportunity to elect the candidate of their choice. *E.g. Rybicki v. State Board of Elections of Illinois,* 574 F.Supp. 1147, 1149 n. 4 (N.D.Ill.1983).

The evidence produced at trial shows that Blacks constitute about 82% of the total population of District 4 and about 66% of the total population of District 7. Although the Black population of District 4 is clearly in excess of the "effective majority" guideline of 65%, there is no evidence that the packing of Blacks in this district has resulted in their having less opportunity than other voters to participate in the political process. In fact, the evidence reveals that, Whites are packed to an even greater extent than Blacks in the City's seven remaining districts; the average White population in districts other than 4 and 7 is 83.8%.

Plaintiffs assert that the population percentages for Districts 4 and 7 set forth above significantly underestimate the extent to which packing occurs in these districts. They contend that when the Hispanic and Asian residents of these two districts are taken into account, the percentages of minorities in Districts 4 and 7 are 88% and 81%, respectively. Dilution by packing or fragmenting, however, can occur only in the context of a cohesive voting population, and plaintiffs produced no persuasive evidence at trial tending to show that either Latinos or Asians vote cohesive-

ly with Blacks. I therefore decline to combine Boston's minority populations for the purpose of evaluating such claims of vote dilution.

### Fragmentation of Latinos

Plaintiffs allege that the City's electoral scheme fragments the Hispanic population by dividing it among five districts. Fragmentation is "the process by which a minority group which could form a sizeable majority in one district is split into two or more districts where the minorities constitute an ineffective political grouping in each district." *Ketchum v. Byrne,* 740 F.2d 1398, 1408 n. 8 (7th Cir.1984).

Plaintiffs cannot and do not contend that the City's Latino population is large enough to form a district majority. In fact, the evidence shows and I find that it would be impossible to create a district that was even one-quarter Latino, considering that Latinos constitute only about 6% of Boston's total population and are dispersed throughout the City. Plaintiffs nevertheless maintain that Hispanics have the potential to become "a considerable voting bloc," and that the existing district plan deprives Hispanics of the opportunity to engage in meaningful coalition building.

▮ Plaintiffs cite no legal authority, and this Court has found none, which support the proposition that a minority which cannot form even a bare population majority in one district may nevertheless maintain a voting dilution claim based on a theory of fragmentation. *In Gingles v. Edmisten,* 590 F.Supp. 345 (E.D.N.C.1984) (three-judge panel), *appeal docketed,* 52 U.S.L.W. 3908 (U.S. June 2, 1984) (No. 83–1968), the district court considered this question and found it doubtful that the concept of vote dilution could properly be applied to any minority population incapable of forming an effective voting majority in a single member district. In reaching this conclusion, the court declared:

> [a]t the effective voting majority level it is possible to say with substantial assurance that to submerge or fracture such an aggregation in a racially polarized

voting situation effectively deprives it of the presumptive capability to elect, solely by its group voting strength, representatives "of its choice." [Citations omitted] The raw power of such an aggregation "to elect" provides a clear measure of its voting strength, hence a fair and workable standard by which to measure dilution of that strength. Short of that level, there is no such principled basis for gauging voting strength, hence dilution of that strength. . . .

We are doubtful that either the Supreme Court in developing the dilution concept in constitutional voting rights litigation, or the congress in embodying it in amended section 2 of the Voting Rights Act intended an application open-ended as to voter group size. There must obviously be some size (as well as dispersion) limits on those aggregations by voters to whom the concept can properly be applied. We do not readily perceive the limit short of the effective voting majority level that can rationally be drawn and applied.

590 F.Supp. at 381.

This persuasive reasoning speaks directly to plaintiffs' claim that the Latino population has been unlawfully fragmented. Because I find from the evidence that no district containing a Latino voting majority can be created, I rule that the City's existing district plan does not impermissibly dilute Hispanic voting strength.

Plaintiffs also contend that the district plan fragments minorities by failing to combine into one district the concentrations of Blacks, Hispanics and Asians located on the peripheries of Districts 4 and 7. In the absence of any credible evidence that Boston's various minority groups vote as a bloc, however, there is no reason to believe that the creation of a district whose majority consists of a plurality of minorities would, in fact, enhance the voting strength of any one minority group. More to the point, there is no reason to rule that the City's failure to create such a district illegally denies minorities meaningful access to the political process. I therefore rule

that this claim of minority fragmentation is without merit.

*Submergence of the South End and Chinatown in District 2*

Plaintiffs' final objection to the existing district map is that it places the minority communities of the South End and Chinatown in the same district as South Boston, whose residents are almost all White and are reputed to harbor strong racial prejudices. Plaintiffs' appear to contend that impermissible vote dilution results whenever a minority concentration is placed in a district dominated by a White population whose social values and political goals diverge markedly from those of the minority. At trial, plaintiff Alex Rodriguez testified that, in his opinion, placing *any* minority voters in a district with South Boston results in denying minorities access to the political process. Transcript at 4–31.

■ I find this opinion unsupported by facts or law. The Asian population of Boston is so numerically small that it would be politically submerged regardless of the district to which it was assigned. Furthermore, the Voting Rights Act neither entitles a minority group to be included in a single legislative district, *Seamon v. Upham*, 536 F.Supp. 931, 945 (E.D.Tex.1982) (three-judge panel), *rev'd on other grounds*, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982), nor requires the electoral segregation of any segment of the majority population whose views conflict sharply with those of the minority. If minority votes are not to be diluted by packing, some parts of the minority population will invariably be placed in districts politically dominated by Whites. Plaintiffs overlook the fact that the issue of vote dilution can properly be evaluated only with reference to the electorate as a whole.

Plaintiffs' arguments are further undermined by evidence which suggests that the minority population of the South End and Chinatown is capable of exerting considerable political influence within the district. Statistics show that the portion of District 2 in which most minorities reside accounts for 48% of the district's voting age popula-

tion. The evidence further reveals that this segment of the district constituted a crucial swing vote in the 1983 elections. The ability to "swing" an election's outcome is a significant form of political access. *Seamon v. Upham*, 536 F.Supp. at 948. For these reasons, I rule that the existing structure of District 2 does not impermissably dilute the voting strength of the City's minorities.

*Extent to Which Minorities' Candidates of Choice Have Been Elected to Office*

■ Although Section 2 of the Voting Rights Act provides specifically that no minority group is entitled to proportional representation, the extent to which either minority candidates or majority candidates whom minorities favor have been elected to office is probative of the presence or absence of vote dilution. In the 1983 elections, which are the only ones ever held under the present district plan, minority candidates won seats on both the City Council and the School Committee. Blacks were elected to City Council in Districts 4 and 7. In the School Committee elections, a Black was chosen in District 4 and a Hispanic was elected in District 7.

Moreover, the success of minority candidates and the influence of minority voters were not confined to the two districts having Black majorities. Two Blacks were chosen by the City as a whole to be at-large members of the School Committee. Electoral statistics also reveal that minority votes determined the outcome of the City Council election in both District 3 and District 8. I find that in each of these districts, the candidate who won the City Council seat was supported by the minority population, but received less than a majority of the White vote.

No definitive conclusions can be drawn from the results of one set of elections. The record proves and I find that Blacks controlled the outcome of the election in Districts 4 and 7 and that minorities also determined the winners in Districts 3 and 8. These results clearly show not only that the election process is freely accessible to minority candidates, but also that the struc-

ture of the City's districts gives equal voting power to minorities and to Whites.

*Marginal Factors*

As noted previously, the responsiveness of elected officials to minority concerns and the tenuousness of the policy underlying the contested voting plan are factors which generally have only marginal significance in assessing the validity under Section 2 of the Voting Rights Act of 1965, as amended. *See supra*, note 2. In this case, neither factor is particularly helpful in determining whether Boston's minorities have been denied access to the political process. With respect to the first factor, the parties offered conflicting evidence concerning the extent to which Boston's government has attempted to alleviate minority problems. As for the second factor, plaintiffs stipulated that they actively supported the adoption of the present mixed district and at-large system for the election of members of the City Council and School Committee. They allege, however, that there is one aspect of the policy underlying the electoral plan which is tenuous. That aspect is the statutory mandate that the City's districts "be drawn with a view toward preserving the integrity of existing neighborhoods." M.G.L. c. 43 § 131. Plaintiffs demonstrated at trial that the Special Committee of the City Council, which designed the district plan, had some difficulty defining and applying this criterion. However, plaintiffs offered no credible evidence to show that the criterion itself was not a legitimate factor to consider in drawing a district map or that its use ultimately resulted in the dilution of minority voting power.

■ Having examined the "totality of circumstances" which affect minority voting strength under Boston's present district plan, I find that the plan gives minorities an equal opportunity to participate in the City's political life and to elect representatives of their choice. I therefore rule that the plan does not violate Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, as amended.

*Plaintiffs Constitutional Claims*

Plaintiffs also assert that Boston's district plan violates the Fourteenth and Fifteenth Amendments of the United States Constitution and Articles 1 and 9 of the Declaration of Rights of the Massachusetts Constitution. To prove that an electoral scheme is prohibited by the Fourteenth and Fifteenth Amendments, a plaintiff must show not only that the challenged plan deprives him of equal access to the political system, but also that the governmental officials who formulated the plan did so with an intent to discriminate. *E.g. City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Because I rule that the Boston plan does not violate the Voting Rights Act, the plaintiffs' case necessarily fails to satisfy the higher burden of proof required by the Fourteenth and Fifteenth Amendments.

I decline to exercise my discretion to reach plaintiffs' pendant state claims, because no Massachusetts court has ever considered the issue of vote dilution under Articles 1 and 9 of the Declaration of Rights of the Massachusetts Constitution, and thus there is no clear Massachusetts authority on which this Court could rely to adjudicate plaintiffs' claims.

Order accordingly.